May it please the Court, my name is Shane Stevenson and I'm representing Appellant Madhuri Patel in this matter. I will seek to reserve three minutes for rebuttal. The District Court's grant of summary judgment to the defendant in this matter was in error. That decision is reviewed here de novo and we're asking the Court to reverse and remand to permit discovery in this case. The Court erred with respect to both exceptions to DeShaney. First, the Court erred in its legal analysis of the Danger Creation Doctrine. Its finding that there was no evidence of deliberate indifference was mistaken, both factually and in terms of the great body of substantial case law in this circuit, including cases such as Munger and Kennedy, which arguably involved much less compelling evidence of state-created danger than the evidence presented here. Simply put, there remains a genuine issue of fact, whether the defendant acted with deliberate indifference, having created a danger. Second, the Court painted with too broad a brush in categorically rejecting any application of the Special Relationship Doctrine to public schools. Such a per se exemption of public schools is not in keeping with the DeShaney-Youngberg line of cases, nor with the holdings of any other circuits. If we said there's a special relationship between the school and the child or the child's parents, whenever a child is put into a special education, which has sort of a semantic ring to it, but isn't it true that would be breaking new precedential ground? Your Honor, two responses to that. First, concede up front there has not been a circuit which has gone on to find that special relationship exists in public schools. But the important thing to note about all those cases, from Middlebuck's all the way through the more recent Haas and Fuss decision in 1999 in the First Circuit, the courts that have opined on it have all said this is a facts on the ground sort of analysis. So three of those circuits have been careful to say we are not going to hold, one of them uses the phrase here and forever, that there is not a scenario where a special relationship will be triggered. But Mr. Stevenson, the analytical linchpin has usually been, in fact always been in the cases that I've read, some sort of compelled restraint, a prison setting, and we don't have that here. Some students think it's that. Right. In fact, one circuit court made the point that a child's lament does not establish the special relationship. True enough, I guess I would say two quick things and then note I believe the more obvious errors by the district court were on the question of state-created dangers, so I would make that point up front. But with respect to Amanda Hingorani, the question isn't whether, as Judge Gould put it, we should adopt or we're asking the court to adopt a per se rule that special education students, by virtue of their disability, by virtue of their individualized education plans pursuant to the IDEA, that all of them are in a special relationship with the state. What we have to remember is that you've got all public school students here and in concentric circles, you've got all disabled students here, and then you have Amanda, a single student with a unique protection plan that was adopted as a result of her physical and sexual exploitation on the school grounds. So as many cases have held, though there was not a preexisting constitutional obligation under the 14th Amendment Substantive Due Process Clause to extend these varied protections to Amanda. When the school made the promise at the end of her freshman year and at the beginning of her sophomore year to extend unique plans of protection, complete adult supervision during the day, as the record indicates, the principal, the vice principal, the head of special ed, and I will submit and reference the record, Ms. Wilhelm herself acknowledges that the protocol was for complete supervision. The amendments to the individual education plan speak to an escort to and from her transportation to the school, in between classes, at lunchtime, and in the bathroom. There is a lingering question, though, is there not, as to whether particularly Ms. Wilhelm knew, in a timely fashion, what the problem had been with Amanda, with the earlier student, Eric? So there's two responses to that, Your Honor. There is, first I should say, there has not been discovery in this case. So Judge Kuhnhauer's ruling is that no matter what is unearthed in discovery, hundreds of e-mails indicating explicit knowledge that Ms. Wilhelm may have had is irrelevant because he's finding no matter what, no set of facts could permit a reasonable jury to find that the defendant is liable, which we say was a serious error. So having not had any discovery, other than what was obtained through a FOIA request, a limited number of documents, what we do have, first, is the meeting at the end of her freshman year, Amanda's freshman year, which Ms. Wilhelm attended, May of 2000 and six, where Ms. Wilhelm herself says, I will be closely monitoring Amanda with regard to boys in the class. This is weeks after all of these e-mails are submitted to the defendant, all the rest of the parties in the school and the school district, showing this explicit sexual conduct. There are two points in the record, Your Honor. Counsel, your time is clicking. I just wanted to, could you narrow your argument down on these facts to the standard of what constitutes deliberate indifference? The problem, just so you can understand the basis of my question, the standard, as I understand it, requires something more than gross negligence. So this is not a gross negligence case against Ms. Wilhelm. It's deliberate indifference. So as you make your argument, would you explain how what you're about to say and have said relates to the deliberate indifference standard? I will, Your Honor. If I could just reference two points in the record to answer Judge Tolman's question. ER 9192, Ms. Wilhelm e-mails her boss and says, I was concerned the same, quote, would happen that happened last year. You have the declaration from Ms. Patel that says sexual exploitation by Eric The point of my question, Counsel, is that is not reflective of indifference. That's reflective of concern. So when you make your statements, would you keep in mind what the standard is? Yes, Your Honor. So in terms of deliberate indifference, the Supreme Court said in County of Sacramento, we are looking at conduct in that middle range, as they put it, between intent, which only applies to this limited context of prison riots, high-speed pursuits and similar such scenarios, and mere negligence. They categorized it as recklessness or gross negligence as being too far away from tort law. So what do we have here to support that showing? In addition to the knowledge that Ms. Wilhelm had of the past conduct, which is important because in Tomas, this Court recently articulated that it requires a showing that knowledge that the subjective awareness of the defendant exists of the danger, and that there was either an inference made by that actor that the danger existed or that a reasonable person with that knowledge would infer the same thing. So here you have a teacher in a room with two other teachers, three teachers, seven students, basically almost a two-to-one ratio. You have explicit knowledge, as the defendant did, that you are to take extra care of Amanda with respect to her comings and goings during the day, particularly the bathroom. And what happened in a room that is quite small, one student left, not just Amanda, but a boy left every time. And if you read his statement to the King County Sheriff's Office, he says, I had sex with Amanda on at least five occasions during Ms. Wilhelm's class. So negligence would mean Ms. Wilhelm was drawing on the board, and she didn't notice that Amanda scooted out of class. She acted recklessly and consciously. You could argue the level of deliberation involved in Ms. Wilhelm's decision stands in stark contrast to all of the body of law enforcement cases that this She made an explicit decision that she described in her email at ER 113. She says, I decided, basically, that it seemed, quote, irrational to interrupt a class, mind you, with three instructors and seven students, to have an instructional aide stand at the door for three minutes, look down the hall to the bathroom that is right next door, and say, and watch Amanda go in and watch Amanda come out, ensuring her protection, which is the but-for cause of Amanda being in the school, because her mother would never have allowed her to be there otherwise. So had they known the breach of the promise would occur, she wouldn't have been in the school. Had they followed the commitment made to the mother, the danger wouldn't exist because she would have been under complete supervision. So this was a conscious decision, I would point out, in sharp contrast to a county of Sacramento where the Supreme Court emphasizes when there's competing interests for law enforcement, it's very difficult. No difficulty here. I agree with Ms. Wellhelm's statement that part of Amanda's, I'll call it treatment, under the IEP was that she was getting closer to graduation in her sophomore year to help her develop so that, in essence, she earned her way up to unescorted trips to the bathroom. So the quick response to that, I think, Your Honor, is to kind of analyze this, as it should be looked at, as a contract with Ms. Battelle, with her mother, who is, by any account, a very involved parent who's very concerned for her daughter's safety. It was not within Ms. Wellhelm's right to unilaterally change the terms of that protection. We are in agreement that if a child is left at the doorsteps of the state, the state has limited obligations to protect it. Once the state takes that child into its care and tells the mother, don't worry, I'll take care of her all day, in the bathroom and everywhere else, and then decides on its own, ah, I think it's time for things to change, that is at least recklessness, certainly evidence of deliberate indifference for her to fail to inform the mother. And you can see this in the responses of her boss, the principal, the vice principal, all of whom are aghast and say, our understanding was complete supervision, our commitment was complete supervision. You can look at Ms. Wellhelm's own communications to another person at the school, where she says in the, pardon me, where she emails and says, our commitment to Ms. Patel is complete adult supervision. So this is in, this is following an email, that's ER 89, Your Honor. So she agrees it's complete supervision. The mother reasonably understands it's complete supervision. The whole district says it's complete supervision. I have a floodgate concern, which I think follows on Judge Gould's question, because we would be extending Ninth Circuit law were we to recognize a special relationship in this scenario. How would you draw the line between injuries to students who attend a school with known gang activity, where we even have, you know, teachers and maybe school security officers posted in the hallways while the students are moving between classes to avoid assaults from gangs? I think the difference, Your Honor, involves the unique particularity of the promise to one student. I think that a scenario like that is more analogous to all of these, the circuits that have looked at special relationship in Little Rock, in Claiborne, in Siemens. Those circuits have looked at those cases and said, a teacher sexually assaulted a student. A group of football players assaulted another football player. In each of those cases, there was not a warning, there was not a known history that the offenders were likely to offend, so the school was not noticed, and no promises were made. We have a gang problem, and we put uniformed police officers in them in order to address those problems, but suppose for budget reasons, we remove the police officers, and we take the hall monitors out, and then somebody gets attacked by a gang. Is that now going under? I would say no, Your Honor. I would say if one particular student was sexually assaulted by gang members, then the school made a particular promise to the parent that they would escort that student, put in a no-contact order, suspend the students that were involved, as they did here, and said if they would agree to a personal escort, which wouldn't ordinarily be reasonable, if they extended that commitment to a single student, perhaps they were targeted because of their race, or for some other reason, if they made that promise, they would be creating that obligation. In grubs, those shifting to danger creation, one could argue when the nurse agreed to work at a prison facility with sexually violent offenders, there's an element of risk to that. There's an element of an assumption of risk. Her supervisor said, we won't let you be alone with them, and then one of them did. But if I could just briefly shift to danger creation, because I think I would point to Your Honors Tolman and Gould's dissent from the denial of a hearing on Bonk and Kennedy. I would say this case more than satisfies even the concerns of Your Honors and the concern of Judge Bybee in dissent in Kennedy. And the easiest example is to look at Munger. The Ninth Circuit has said when a law enforcement officer arrived at a bar where Lance Munger was intoxicated, arguing with patrons, it was 20 degrees outside, he walks outside in jeans and T-shirt. Law enforcement hadn't gotten there yet. At that point, he'd created a danger for himself. Law enforcement showed up. He was not legally entitled to be in the bar. He was not legally entitled to drive. Law enforcement said, you can't get in your car. He walked away, and he died. This court held that danger was created by the state, and a jury got to answer that question. If the Ninth Circuit holds that that was danger creation, it is inconceivable to think that this was a danger creation in a scenario much more compelling. I seek permission to reserve the balance of my time. You have the balance. You don't need my permission. Good morning. May it please the Court. My name is Sam Gordon, and I represent the Kent School District, but more specifically to the issues at bar today, the teacher in this matter, which is Francine Wilhelm. Your Honor, this case is about whether there are facts establishing the stringent standard of proof known as deliberate indifference with regard to Wilhelm's actions on the dates in question. Then before getting to that, does your client accept that there can be a special relationship between, if not all, at least some special ed students and the school or their supervising teacher, so that if there's deliberate indifference, then there's a claim here? The short answer is no, Your Honor, not without extending Ninth Circuit precedent and any other circuit that I'm aware of. It isn't as though there isn't a possibility that there could be a special relationship, but the current state of the case law is that that special relationship, as it relates to a 1983 claim, and that's a very specific use of that term, special relationship, in order for that to arise, there needs to be some sort of involuntary custodial control. And that brings me to one of my very first points that I wanted to make. In order to bring a 1983 claim under a state actor, we're looking at the 14th Amendment privileges and immunities clause. And what the Supreme Court has stated is that we need to see some level of an affirmative act restraining the individual's freedom to act on his or her own behalf. There is nothing involved here that there are no facts involving any restraint upon Ms. Amanda Hingorani. In fact, I guess the argument sort of is that they should have restrained her more. But that doesn't put it within the special relationship category necessary to overcome the basic premise, which in Section 1983 stands for in this regard, which is that mere negligence or lack of due care by state officials does not trigger the protections of the 14th Amendment and therefore does not state a claim under Section 1983. Did A.H. in her IEP, did it indicate that she was not, it wasn't anticipated she would roam around the school alone? Or is the IEP silent on that? About whether she would be able to roam around the school alone? The IEP specifically states when an escort is needed. It is very clear that it is needed in order to escort her between classes and in order to make sure that she gets to and from her transportation, which would be outside of the school and getting inside to the school. If the IEP, if the individuals involved in creating the IEP intended for the IEP to include escorting beyond what it says, it would be written in here. The IEP is a cooperative agreement between the school and the administration and the teachers and the parent. The parent is actually at the meetings leading up to it and actually signs off and ultimately approves of the IEP. This is actually where Ms. Patel's 14th Amendment claims could have arisen. If she had a problem with the manner in which the IEP was fully set forth, in other words, the final product that was set before her and said, here's what we agree to do for you. If she had a problem with that, she had a remedy. She had due process in order to ensure that her concerns were fully heard and that the administration or the district was going to afford her the same procedures that it would afford any other student, which would be more of a substantive claim, but the procedural elements of due process were available to her in an appellate style or review style process. She did not pursue that. I understand that. I have, I guess in my own mind, some additional thoughts and questions about whether we should extend our precedent to say that a special relationship can arise, not with all special ed students, but with some in some circumstances. And the circumstances with A.H. are pretty extreme, so maybe. But assuming there is a special relationship, does deliberate indifference would still have to be shown as the second element, is that right? No, Your Honor, I don't believe it does. I believe that once... So deliberate indifference is only the element if it's a state-created danger? That's correct, Your Honor. Okay. Yes. So if we should be so bold as to say that Amanda A.H. was in a special relationship with the school and her teacher, is that sufficient without more to create liability under 1983? No, Your Honor, it isn't sufficient in and of itself. The fact that there's a special relationship and that any injury then arises with respect to that student does not mean that every teacher who happened to be in charge of that student at that time would be subject to an individualized liability under Section 1983. So what else would be required beyond the special relationship? The teacher would have to deprive the child of a constitutionally protected liberty interest. So, in other words, the actions of the teacher would need to be the cause in fact of the actual injury. There needs to be a relationship between what the teacher did or did not do. And, again, if we're talking about that there is a special relationship, then it's going to bring omissions. Assuming there is for a minute, then if the teacher's omission to supervise her going to the restroom deprived her of an interest in her body's integrity, then that might be enough, right? Yes, it might be enough, Your Honor, if there was reason to believe that the special relationship included in it some sort of knowledge of an appreciated danger related to the bathroom in this particular student. Otherwise, the children are going to go to the bathroom. That's a normal course of conduct throughout the day. Is there no federal court, no circuit court has ever said that there is such a special relationship over disabled students? No, I do not believe that has ever been stated outside of the context of actual involuntary custodial control. What about a district court? Are there any published district courts that have ever made that leap?  Okay, thank you. I'll let you go back to your argument on danger. Could you address the point that counsel made that under deliberate indifference, Ms. Wilhelm's deliberate decision, as it were, to allow Amanda to go outside the classroom unsupervised and that she did that deliberately? Why wouldn't that meet the definition of deliberate indifference to a known danger? Well, in order for Ms. Wilhelm to have been deliberately indifferent to a known danger with respect to Amanda, Ms. Wilhelm would have needed to have some appreciation for the particularized risk. Well, why isn't that a fact question? Aren't the e-mails that have been put in, doesn't that suggest that at least she wrote one e-mail after, I think, finding them hugging in the hallway? She said, make some statement to the effect that this sounds like it might be a reactivation of what happened last year. Yes, Your Honor, she does say that. And what was the last year incident? The last year incident is a little bit complicated, and please allow me to parse it out into two different categories. What everyone at the school knew about the last year incident at the time these incidents were taking place and what they discovered subsequent to these particular incidents, and that is this. The principal, the assistant principal, the program director, and Ms. Wilhelm have all stated affirmatively on this record that at the time these incidents were occurring between Amanda and Matt, that they knew nothing about sexual contact with Amanda under any circumstances. They did not know anything about sexual contact occurring with Amanda at school, and they certainly didn't realize that there was any sexual contact at school related to a bathroom. They did not know this. They knew there was some type of, as I understood it, I could be wrong, but they knew there was some type of misbehavior in the bathroom, but they didn't know it had a sexual contact. No, Your Honor, the record does not state that. In fact, they did not know anything about a bathroom incident at all prior to these incidents. So they knew there was some misbehavior, but not where it was. That's correct. And, in fact, there's no indication that any sexual acts ever took place prior to them discovering it after the fact, after finally questioning Amanda Hingorani a little bit more and learning that, in fact, there were sexual encounters on campus previously. But none of the administration knew that. As far as what they did know about prior bad acts and prior problems with the kids that were involved in those particular incidents, first of all, the administration knew more than Ms. Wilhelm knew. There's no evidence that Ms. Wilhelm knew exactly what the contents of those e-mails were that were revealed initially that brought up about all the concerns about Amanda. There's no evidence that she read those e-mails or understood the sexual innuendo and discussions that were going on in those e-mails. The only indication is that the administration knew, that the principal and possibly even the program director might have read those e-mails. But what we have to look at here is not respondeat superior liability. Well, can I just interject? Counsel made the point at the outset that there hasn't been discovery. You say there's no evidence. How would Amanda know without discovery what the facts are underlying the blanket denial of knowing about bathroom incidents or sex before Amanda and Matt? Is your question, Your Honor, how would Amanda be able to yet prove whether Ms. Wilhelm knew it? Yeah. Okay. Well, there's a difference between there has been no discovery and no opportunity for discovery, Your Honor. Now, this is a CR 56 motion, and when we filed this motion, the responding party had an opportunity at that time to put together what they needed in order to defeat this motion for summary judgment. If they needed more time for a deposition or they needed more time to get some more disclosures of e-mails about what Ms. Wilhelm knew, they could have asked for that at that time, and they did not, to my knowledge. So the plaintiff in this matter under FRCP 56 has the duty of setting forth evidence. We understand that. You made your point. You've answered my question. One of the things brought up briefly in the reply, a plaintiff's reply, is that the idea of an affirmative act being necessary or not. I'll let this court determine whether they've all but conceded the fact that there does need to be an affirmative act by Ms. Wilhelm, not by the school, but by Ms. Wilhelm, that set the course of conduct in motion that led to the actual injury. Well, okay, so I kind of distracted you from your line of answer, and my question was to bring it back to the specifics. Or maybe you were going to come back to that, Your Honor. What is stated is that Ms. Wilhelm made a decision to allow her to go out unsupervised to the bathroom. There's no dispute about that, as I understand it, and that Ms. Wilhelm made a conscious decision not to have one of the aides. Was it full-fledged teachers, or they were just teaching assistants, or what were they? They were aides. Okay, they were aides. So she had seven students in the classroom. Three adults. Three, pardon? Three adults. And three adults. And she, as I understand the record from what we have, Amanda was out for a fair amount of time, and she made a conscious decision not to supervise her, or at least have even somebody look down the hallway. So why doesn't that get us over the threshold? I would encourage the court to take a very close look again when it's reviewing this case at ER 113, which is the exact document that the appellant has raised on this issue. What that document does not state is that a conscious decision was made to not use an escort. It says that a conscious decision was made to allow Amanda to use the restroom. It also doesn't state that there was a conscious decision to allow her to use the restroom at the same time as Matt. There's no indication that that was done purposefully. Same-sex restroom? No, it is not. They're two different restrooms. I mean, go outside the classroom, both with the hall pass. That's right. Both of the restrooms are outside of the classroom. However, they are connected to the classroom, and these restrooms are not used by the general population of the school. But she does not make a conscious decision to not use the escort, and I'd also like to point out, I see I'm out of time, the IEP does not require an escort to the bathroom. So she didn't need to make a conscious decision to not use an escort for the bathroom. That was not something that was ever required of her. That is not indicated by this record at 113 that she made a conscious decision to forego that. Thank you, Your Honor. Thank you. I don't know if counsel's been to the high school, but we've been to the high school. The boys' bathroom is a distance down the hall, and Matthew's statement to the King County sheriffs are that he took Amanda by the hand and led her to the boys' room. So while that's sort of beside the point, isn't the issue about where Amanda was? Well, it matters in this sense, because Ms. Wilhelm protests that she was vigilant. Judge Kuhnauer found that she was vigilant because, in part, she says the bathroom was right next door and I could hear everything and know what was going on. Apparently not. Secondly, in terms of the floodgate concerns, there's no ---- You're saying that the girls' bathroom was next door. That's right, and that's not where she went. But not the boys' bathroom. Correct, Your Honor. Again, and I want to point out just very briefly in my limited time, another error by the district court. In addition to its just overlooking the fact that there is, in fact, evidence, if you look at ER 105, there's evidence that Ms. Wilhelm attended the important 9-1306 meeting. Her name was redacted from ER 60 accidentally. We've supplied the court with that correction. But 105 was in the record. Judge Kuhnauer just missed it. He said there's no evidence she was at the meeting. There was evidence. The vice principal said she was there. There's a discrepancy between ER 91 and ER 95 that's very interesting. Ms. Wilhelm writes an email to her boss saying, I have a concern that Amanda and Matt are involved again. She uses the phrase involved again. Her boss says, this is serious. Reach out to Ms. Patel. She writes to Ms. Patel, and you will see in ER 95, it is almost a copy and paste of what she wrote her boss. But what did she take out? The word again. There's evidence that she knew there was a relationship between these two, and she still let them out the door. She hasn't been deposed yet to seek clarification on that. Judge overlooked that. He overlooked the fact that there was. But did that email come after the report that Matt had been seen hugging Amanda in the hall? All of that came out after the email that notified of the incident. And doesn't it relate to the fact that she noticed at one point that Matt was gone at the same time Amanda was gone, and that's why she raced after Amanda? I'm not sure if the record shows that Ms. Wilhelm articulated a subjective knowledge that they had gone out the door before, but there was. Isn't that why she raced after Amanda when she realized that Matt and Amanda were gone at the same time? Right, right. Yes, Your Honor. So I'm not sure I understand your point. It makes sense to me that she would say in the email, I'm concerned that she's spending time with Matt again. Well, she didn't tell the mother had no knowledge that there was any, that Ms. Wilhelm had knowledge of any interaction between Matt and Amanda. Now, there's an email earlier where Ms. Wilhelm says that Amanda has a particular interest in a, quote, new boy in school. That's at ER 87. That boy might be Matt. Wilhelm sent an email to the mother alerting her? Wilhelm sent just the email I referenced, Your Honor, saying that she just noticed that there was involvement and I raced out the door, and I'm concerned she was going to, quote, engage in the same thing that happened last year. Okay, but that sort of cuts against your theory of deliberate indifference if she's warning the mother that she's got some concerns about what might or might not be going on. Well, she was told to tell the mother, first of all. So at that point, sort of the cat was out of the bag. There was a concern. She knows she had been letting them out of the classroom four or five times by Matt's account already. So at this point, a light bulb could have gone off in her mind saying, oh, boy, they've been going out a lot of times. I better figure this out. I screwed up. I better cover myself. That's why the principal says see me and is careful not to write anything. Counsel, I see you're over your time, but I have a question. I hope you could give a 15-second or so response. What is your answer to the argument by your colleague for appellee that we should give significance to the fact that your client did not make a Rule 56-F motion specifying discovery you'd want to do to respond to the summary judgment? As counsel I think indicated, to my knowledge, that that door was not open to permit full-blown discovery at the time that the motion was filed for final disposition before Judge Kuhnhauer. That's all I have on that. So that's a motion that you make after the other side opens the summary judgment plea? Correct, Your Honor. And you didn't file a 56-F response? I'm not aware of that now. Okay. All right. Counsel, we thank you both for your arguments. The case argued is submitted. And we'll take our brief recess here, and let's see if I've got to move there. Okay. We'll be in recess for kind of a few minutes. Thank you, Mr. Chair. All rise.
judges: Fisher, Gould, Tallman